**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0022n.06**
**Filed: January 9, 2006**

**No. 05-5074**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

LILA CREECH,                                                  )
                                                             )        ON APPEAL FROM THE
    Plaintiff-Appellant,                                 )        UNITED STATES DISTRICT
                                                             )        COURT FOR THE MIDDLE
    v.                                                   )        DISTRICT OF TENNESSEE
                                                             )
UNUM LIFE INSURANCE COMPANY OF NORTH                         )
AMERICA and WILLIS NORTH AMERICA, INC.,                      )
                                                             )
    Defendants-Appellees.                                )
                                                             )

_____

BEFORE: SILER and GRIFFIN, Circuit Judges; and KATZ, District Judge.[*]

PER CURIAM.

This case arises under the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1001-1461. Lila Creech was enrolled in an employee benefit plan sponsored by her employer,

Willis North America, Inc. ("Willis"), and insured by UNUM Life Insurance Company of America

("Unum"). On May 30, 2000, at age 54, Creech stopped working due to conditions affecting her

---

[*]The Honorable David A. Katz, United States District Judge for the Northern District of
Ohio, sitting by designation.

hands, wrists, and arms, including chronic tendonitis, epicondylitis, and cubital tunnel syndrome.[1], [2]
Unum paid benefits for two years as called for by the policy's "own occupation" provision, finding
that Creech's conditions prevented her from continuing at her job.

The policy provided that to be eligible for continued benefits after two years, Creech had to
show that her condition prevented her from working at *any* other occupation for which she was
qualified. Finding that Creech's experience qualified her for several jobs that were consistent with
her medical limitations, Unum[3] refused to continue benefits after the own-occupation period ended
on November 28, 2002. Although Unum based this determination on a Transferable Skills Analysis
("TSA") done by a company called Genex, Genex based its TSA on Unum's statement that Creech
had worked as a Risk and Insurance ("R&I") Manager, when in fact she had worked only as a Senior
Client Manager.

After exhausting Unum's internal appeals procedures, Creech filed an action in the United
States District Court for the Middle District of Tennessee in July 2003, claiming the discontinuation

---

[1]Cubital tunnel syndrome is a group of symptoms that develop from the compression of the
ulnar nerve within the cubital tunnel at the elbow. Symptoms can include parasthesia (tingling) of
the fourth and fifth fingers and weakness of the intrinsic muscles of the hand. STEDMAN'S MEDICAL
DICTIONARY 1951 (27th ed. 2000) ("STEDMAN'S").

[2]Creech secured a ruling of disability from the Social Security Administration ("SSA") and
a worker's compensation award.

[3]Although both Willis and Unum are named defendants, Unum made the decision to
discontinue disability benefits. Thus, we refer to both defendants collectively as Unum. *See
Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 357 n.1 (6th Cir. 2002) ("Although both
Met Life and Lockheed Martin are named defendants, the decision to deny Spangler benefits was
made by Met Life. For purposes of this decision, we treat the case as if it is only against Met Life.").

of benefits was arbitrary and capricious in violation of ERISA. She sought an order compelling Unum to pay benefits retroactive to the discontinuation date, with prejudgment interest, and to reimburse her attorneys' fees and costs. In August 2004, the district court granted judgment on the administrative record to Unum, and, in November 2004, it denied Creech's motion to alter or amend and her motion to remand to Unum for further consideration. Creech filed this timely appeal.

We reverse the district court's judgment because Unum's denial of benefits was arbitrary and capricious. Substantial evidence supports Unum's assessment of the limitations caused by Creech's condition; namely, although she cannot "power grip" or frequently keyboard, she retains medium dexterity and is capable of simple grasp, fine manipulation and occasional keyboarding. Thus, there was nothing arbitrary about Unum's evaluation of the medical evidence and weighing of the competing medical opinions. The problem comes in Unum's assessment of Creech's skills. Creech shows that her duties as Senior Client Manager cannot reasonably be viewed as equivalent or closely analogous to those of an R&I Manager. For its part, Unum provides no credible explanation for falsely telling Genex that Creech worked as a R&I Manager, when it could and should have simply given Genex Creech's actual job description. Unum knew Genex would rely on the inaccurate information in developing its TSA, and, in fact, Genex did rely on it. The resulting TSA is not legitimate or probative in determining the jobs for which Creech is qualified.

On remand, the district court shall issue an order directing Unum to pay Creech disability benefits from the date on which the policy's "own occupation" period started and continuing through

the present. The district court shall address in the first instance whether Unum should pay prejudgment interest, fees, and costs.

This opinion shall not be construed to preclude Unum from requiring Creech to undergo new medical examinations and provide new medical evidence and opinions showing that, after the date of said order, she remains unable to perform any occupation for which she is qualified.

I.

The parties agree that the Willis plan is an employee benefit plan as defined by ERISA, 29 U.S.C. § 1002(1) & (3), and is covered by ERISA. Title 29 U.S.C. § 1132(a)(1)(B) gives a participant the right to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

We review a denial of benefits challenged pursuant to § 1132(a)(1)(B) de novo, unless the plan expressly gives the administrator or fiduciary the discretionary authority to determine eligibility for benefits or to construe the terms of the plan. In that case, "the highly deferential arbitrary and capricious standard is appropriate." *Kalish v. Liberty Mut. / Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 505-06 (6th Cir. 2005) (internal citation and quotation marks omitted), *reh'g and reh'g en banc denied* (Oct. 21, 2005); *see also Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996) (citations omitted). The Unum policy states, "[w]hen making a benefit determination . . . UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy."

The denial of benefits will not be considered arbitrary and capricious "so long as it is possible to offer a reasoned explanation, based on the evidence, for" the denial. *Kalish*, 419 F.3d at 506 (internal citation and quotation marks omitted). Put another way, we will uphold a denial if it is "rational in light of the plan's provisions." *Jones*, 385 F.3d at 661 (internal citation and quotation marks omitted); *see also Wise v. Kind & Knox Gelatin, Inc.*, 429 F.3d 1188, 1190 (8th Cir. 2005) (plan administrator did not abuse discretion by denying long-term disability benefits) ("we must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision") (citation omitted). This standard equates to the substantial-evidence standard used to review Social Security disability decisions. *See Baker v. UMWA Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

Nonetheless, we will not rubber-stamp the administrator's decision; "[u]nder the arbitrary-and-capricious standard, both the district court and this court must exercise review powers." *Jones*, 385 F.3d at 661 (citation omitted). We will also be mindful of the conflict of interest inherent in Unum's dual role as insurer of the plan and the party authorized to determine whether Creech is entitled to benefits. While such a conflict of interest "does not alter the standard of review, . . . [it] should be taken into account as a factor in determining whether the . . . decision was arbitrary and capricious." *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998) (internal citation and quotation marks omitted).

Lastly, "[o]ur review of the ERISA administrative decision is limited to evidence presented to the Appeal Committee." *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 441 (6th Cir. 2005) (citing *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 617-20 (6th Cir. 1998)).

II.

Creech worked in Willis's Nashville office in various capacities, ultimately as Senior Client Manager, from December 1971 until May 2000. Creech states that before joining Willis, she worked "as a certified Medical Records Technician, which required constant typing/transcription of medical records (History's, Physical's, Surgical Reports, Psychiatric Evaluations, Medical/Surgical Consultations, Pathology Reports, etc.) and constant use of both hands . . . ."

She was insured under a Unum policy which went into effect in January 1997 and provided:

You are disabled when UNUM determines that:

•      you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
•      you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

Creech's May 2000 application for benefits cited "chronic reoccurring medial and lateral tendonitis,"[4] which she described as a repetitive-motion injury that began in 1992 and worsened over time.

In April 2000, Dr. David Gaw conducted an independent medical examination of Creech in connection with her application for worker's compensation benefits. Gaw's report stated,

She has worked for Willis of Tennessee, Inc. since 1971 at a job which largely now requires the operation of a computer. Her entire day is spent doing data entry, typing

---

[4]Tendonitis is the inflammation of a tendon, a non-stretchable fibrous cord that connects the fleshy (contractile) part of a muscle with its bony attachment. STEDMAN'S 530 and 1794.

out faxes, etc. She continually uses the hands. She has had significant pain in her elbow dating back to 1992. It began when she was doing something at work that required continuous repetitive movement of the wrist due to the changing of her work station . . . . When the pain gets worse, she has difficulty with any activity that requires typing, keying, gripping, squeezing or holding things.

Gaw diagnosed "chronic lateral epicondylitis involving the right elbow," i.e. a prolonged inflammation of the projection of the arm bone. STEDMAN'S 348, 603. Although Gaw found full movement of the shoulder, right elbow, wrist, fingers and thumb, he observed:

She has tremendous tenderness along the lateral epicondylar area and along the extensor[5] muscle mass. She has a lot of pain to dorsiflex [upward extension of the hand or fingers] against resistance and there is little weakness of dorsiflexion against resistance as compared to the opposite side. It is significantly painful but it also appears to be somewhat weak. She has some pain to supinate [bend backward] and to pronate [bend forward] against resistance but there is more pain to supinate. There is no real weakness noted. She has some pain to extend the large finger against resistance with only minimal weakness noted . . . .She has no atrophy or weakness of the intrinsic muscles of the hand. There is a 1 cm. atrophy of the forearm muscles on the right side measured the same distance from the olecranon [the elbow bone] as compared to the left. She has good pulses in her hand and wrist. There is no joint swelling or edema [excessive fluid] noted around the thumb, wrist or finger joints.[6]

Gaw noted that the condition is "an overuse syndrome and the only effective known treatment . . . is to decrease the pain[-]producing activities." Gaw stated that Creech could keyboard only "on an

---

[5]An extensor is a muscle whose contraction causes movement at a joint so that the limb or body becomes straighter. To put it another way, the extensor's contraction causes the parts proximal to (near) the joint to get farther away from the part distal (distant) from the joint. An extensor is the opposite of a flexor. STEDMAN'S 634 & 686 (extensor & flexor), 529 & 1468 (distal & proximal).

[6]STEDMAN's 536, 566-67, 1245, 1457 and 1730.

alternating basis," using her right hand no more than half the time, e.g., two hours on and two hours

off. Gaw found slight atrophy and slight weakness upon upward extension of the hand or fingers.

About eight months later, in December 2000, Creech's treating orthopaedic physician, Dr.

Michael Milek, wrote a report stating,

> The exam related to the right upper extremity shows that she is tender around the radial tunnel [the radius is the shorter of the two forearm bones].[7] The lateral epicondyle is not inflamed. The lateral ridge is normal.
>
> Pronator is normal. Cubital tunnel [relating to the elbow or ulna] is normal. Distally, she has a negative Tinel's, negative Phalen's [a test for carpal tunnel syndrome].[8] [S]ensation is essentially normal. Additional history indicates that when she rests her arm on a car door or side of an arm table, etc., she develops some numbness in her ulnar nerve distribution and going to the radial side.
>
> On today's exam, one cannot make a case for ulnar nerve compression but historically, that is what she is doing [sic].
>
> Based on today's exam, the clinical impression would be right radial tunnel and possible positional ulnar nerve neuropathy. Evaluation would be EMG's[9] of the radial ulnar nerve and carpal tunnel for completeness sake. If indeed on follow up exam and there is a paucity of other findings and she continues to have signs of radial nerve compression, I would recommend radial nerve decompression.
>
> Work: She is on disability now. I would *recommend no change* in that at this stage until this has been evaluated.

---

[7]STEDMAN'S 1501 and 1506 (radial tunnel and radius).

[8]Tinel's Sign is "a tingling sensation ["pins and needles"] in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration [sic] of the nerve." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1703 (30th ed. 2003). Phalen's Maneuver involves reducing the size of the carpal tunnel by holding the hand straight, with the wrist fully flexed or extended, for 30 to 60 seconds. *Id.* at 1094 and 1414.

[9]EMG stands for electromyogram, a graphic representation of the electrical currents associated with muscular action. STEDMAN'S 576.

Emphasis in original. On December 21, 2000, Milek noted, "[w]ork, should it be available, would be limited work with the upper extremity. That is, she cannot do computer work without frequent breaks, probably no more than a half a day at this stage and at that, she would require some changes." Milek again opined that Creech should do "no computer work without frequent breaks."

> Creech described her job responsibilities and experience as follows:
>
> Marketing, sales & service of Lg. commercial prop. & Cas. Ins. Clients, many of whom have purchased specialty Prop. & Cas. Ins. Programs . . . Gather Renewal Info from client; prepare ins. specifications and applications for carrier(s), market & negotiate terms & pricing with various carriers & prepare final proposal for client. Formally bind coverage with various carriers, prepare Binders, Invoices, Auto ID Cards & Certificates of Ins. for Client, etc. Check Policies when received for accuracy and negotiate corrections then prepare cover for large three-ring binder containing policies & deliver & review w/ Client.

Based on Creech's description, Certified Rehabilitation Counselor Wendell Wallace analogized her position to that of claims adjuster in the U.S. Department of Labor's Dictionary of Occupational Titles ("the Dictionary"). In January 2001, Wallace opined that claims adjuster work required occasional[10] keyboarding and Creech's work as a senior client manager required less keyboarding than that. Wallace downplayed the amount of keyboarding required by Creech's work, noting, "Claimant was working as a Senior Client Manager – this is not the same as a Data Entry Clerk."

---

[10]The Dictionary defines frequencies as "never," which means not at all; "occasionally," which means 1% to 33% of a work shift; "frequently," which means 34% up to 66%; and "repetitively, constantly or continuously," which mean 67% or above. The Dictionary's job descriptions "are the preferred method of job description in disability determinations." *Willis v. Baxter Int'l*, 175 F. Supp. 2d 819, 822 (W.D.N.C. 2001).

Relying on Wallace's opinion, Unum determined on January 17, 2001, that Creech's occupation required only "occasional fingering." Because the reports of examining physician Gaw and treating orthopaedist Milek indicated that Creech could do limited computer work "with frequent breaks," Unum found that Creech was "able to perform keyboarding activities on [an] occasional basis." When Unum informed Creech of this determination by telephone, she responded that her job "requires 100% computer work" eight hours a day. After Unum conducted further interviews with Creech, Wallace revised his opinion. Wallace now found that Creech's Willis job required frequent keyboarding, meaning that her ability to occasionally keyboard did not enable her to continue. Relying on Wallace's new opinion, Unum reversed itself in February 2001 and approved up to two years of disability payments under the policy's "own occupation" provision.

In June 2001, treating orthopaedist Milek provided a supplemental statement that diagnosed Creech with bilateral epicondylitis, classified her restrictions as permanent, and stated that she was limited to "occasional use R[ight] arm, no heavy lifting." Milek indicated that Creech could use both her hands for "simple grasp, fine manipulation, and medium dexterity" but not for "power grip." On a form that asked how many hours Creech could perform various levels of activity in an eight-hour day, Milek checked "sedentary activity" without stating a number of hours. Milek also wrote "Disabled" and stated that there would "never" be a significant change in functional ability.

In February 2002, a Unum representative interviewed Creech at her home. He observed that Creech wore two wrist/hand/forearm splints but could use her hands in an animated fashion while

speaking, hold a cup in either hand without support from the other hand, lift a small dog, sit and stand without using hands or arms for support, and function without grimacing or wincing in pain.

Unum requested additional supplemental statements from Creech and Milek. Creech wrote that she experienced constant pain in both arms and had to hire a housekeeper to help with laundry, groceries, and other chores due to loss of strength in both arms. On a Functional Abilities Form dated February 13, 2002, Milek again checked boxes indicating that Creech could not perform a power grip with either hand but could perform simple grasp, fine manipulation, and medium dexterity. He again indicated that although he "never" anticipated a change in Creech's functional ability, she could perform sedentary work; unlike his June 2001 statement, Milek did not write that Creech was "disabled."

In April 2002, Unum sent Milek a letter seeking to clarify the significance of his checkmark next to the box "sedentary activity" on the February 2002 Functional Abilities Form. Unum asked Milek to sign the letter if he meant to indicate that Creech had the capacity to perform eight hours of sedentary work. Milek signed the letter and faxed it back on May 8, 2002.

One week later, on May 15, 2002, Unum stated that, in reliance on Milek's confirmation of Creech's eight hours daily sedentary capacity and hand manipulation ability, it was discontinuing her benefits. Unum explained, "Your occupation as a Senior Client Manager is considered a sedentary occupation. A sedentary occupation may require lifting or carrying up to 10 pounds occasionally. Also, occasional standing, walking and sitting 6 to 8 hours per day may be required. Generally a power grip would not be needed to perform a sedentary occupation."

Creech contacted Unum and obtained a written explanation of how Unum interpreted the terms used in the Functional Abilities Forms, e.g., fine manipulation, medium dexterity, and bimanual dexterity. She provided that information to Milek, and on June 5, 2002, he submitted a revised form. Unlike Milek's June 2001 and February 2002 assessments, Milek now stated that Creech could *not* perform fine manipulation or medium dexterity, and he criticized Unum's terms as "misleading." Milek's accompanying statement noted that Creech was "improving with therapy" but that her elbows still hurt and she was restricted to occasional use of her arms.

After reviewing Milek's revised assessment, Unum found that he provided no evidence to support the change in his opinion: "the change in the reported R/Ls [restrictions/limitations?] ("no fine manipulation") would need to be supported by additional evidence – e.g. – PM&R evaluation, PCE [physical capacities evaluation] with specific attention to fine grip, etc." Creech appealed to Unum, and, in July 2002, Unum denied her appeal, again concluding that Milek provided no new evidence to support the more negative June 2002 assessment.

At Unum's request, Dr. Barry Gendron reviewed Creech's files; on August 2, 2002, Gendron prepared notes agreeing that Milek presented no new evidence to support his changed assessment. Gendron also noted that Creech's reported daily activities, such as "frequent clipping of coupons, washing and folding clothes, dusting, [and] reading" required "significant functional reserve" in her hands and arms. On August 16, 2002, Gendron wrote, "[b]ased on the objective medical data, it is likely that the claimant can use keyboard occasionally, not frequently in vocational tasks." Unum reversed its discontinuation of benefits, finding that Creech could occasionally keyboard, which was not enough to do her own occupation, which Unum now realized required frequent keyboarding.

- 12 -

After November 2002, Creech had to show that her condition prevented her from doing *any* work for which she was qualified. To determine whether Creech could adjust to other work, Unum asked Genex to perform a TSA. Genex's TSA listed Creech's diagnosis as right-sided chronic tendonitis / lateral epicondylitis. Relying on Gendron's August 2002 review of Creech's medical records, the TSA considered her to be restricted to sedentary work but capable of using her hands for simple grasp, fine manipulation, and medium dexterity. Like consulting physician Gendron and treating physician Milek, the TSA found that Creech could keyboard only occasionally.

In considering Creech's education and employment history, the TSA relied on vocational rehabilitation expert Wallace's revised characterization of her as a risk and insurance manager, rather than a claims adjustor (per Wallace's January 2001 opinion) or senior client manager (her actual job). Consistent with the definition of R&I manager, the TSA found that Creech had substantial mathematical, accounting, and financial recordkeeping skills, the ability to estimate real property values, the ability to direct and plan the work of others, the ability to hire and supervise engineering and safety experts, and perhaps the ability to negotiate contracts with unions. The TSA concluded that Creech could work in six positions, four of which required only occasional keyboarding: department manager, customer-complaint clerk, contract administrator and information clerk.[11] Of those positions, three also met the threshold established by Creech's prior salary: department manager, customer-complaint clerk, and contract administrator.

---

[11]Genex's TSA apparently considered the positions of employment interviewer and supervisor of order-takers to involve more than occasional hand use and/or keyboarding.

On November 14, 2002, Unum informed Creech that since she could work in those positions, she would be ineligible for benefits once the "any gainful occupation" period started later that month.

Creech appealed in February 2003, submitting opinions based on more-recent examinations. Following a January 2003 examination, Dr. Gaw reported that Creech was suffering soreness around the right rotator cuff and pain moving her shoulder against resistance, but no weakness. Gaw also noted marked tenderness in two parts of her right arm: (1) around the right lateral epicondylar area, from the extensor muscle into the forearm, and (2) around the medial epicondylar area, over the ulnar nerve in the posteromedial groove, i.e. the groove "behind and to the inner side" of the arm. STEDMAN'S 1431 (posteromedial). Gaw further reported paresthesias (tingling) in Creech's right little finger. Gaw made the same findings for the left arm, but not to the same degree of severity.

As to both arms, Gaw reported that Creech had general soreness and tenderness, as well as pain to bend her "upper extremities" forwards (pronate), bend them backwards (supinate), extend them upwards (dorsiflex), or to flex her palms (volar flex) against resistance. STEDMAN'S 536, 1457, 1730, 1977. Although Gaw described the soft tissues of Creech's arms as hypersensitive to touch, especially the right arm, he noted no weakness or atrophy of the intrinsic muscles of the hands.

Gaw concluded that Creech would have "difficulty doing any repetitive type activities that involve typing, gripping, squeezing, writing, pushing, pulling or twisting" and therefore would be unable to do either her Willis job "or a similar type job." He did not give examples of what jobs he deemed to be similar to Creech's job for this purpose.

Creech also submitted a report from Dr. Glenn Booth, M.D., Ph.D., based on his May 2002 examination. Booth's report listed fourteen problems, only one of which is relevant here. Under Problem #6, degenerative and traumatic arthritis, Booth noted only the following with regard to Creech's hands and arms: "She has had chronic right elbow tendonitis recently treated by Dr. Milek. She has had splints and other treatment. . . . . She has been told she has bilateral cubital tunnel. She treats her elbows with ice and is careful with her activity. She has had physical rehabilitation for this." Booth's impressions included bilateral elbow tendonitis, bilateral cubital tunnel syndrome, and bilateral radial ulnar nerve damage, but he provided no narrative discussion to support these diagnoses. Booth's only findings vaguely related to these diagnoses were: "JOINTS: Degenerative changes. Elbows without tenderness now."

Unum had Dr. Gendron review the new Milek report and the Booth report. Relying largely on Gendron's conclusions (discussed below), Unum denied Creech's appeal in May 2003. Creech filed her complaint in the district court in July 2003.

### III.

Creech makes much of the fact that the SSA determined that she was disabled, i.e. unable to return to her past relevant work or to adjust to other suitable work. But the SSA's determination did not bind Unum, nor did it impose some heightened duty on Unum to explain why it did not agree with the SSA determination. When determining whether a DIB or SSI claimant is disabled, the Commissioner of Social Security must follow a detailed set of statutory and regulatory provisions that spell out what evidence to consider, how to decide the relative weight and credibility to accord

each medical opinion, how to factor in the effect that the claimant's age may have on his ability to work, etc. Those statutes and regulations simply do not apply to employee benefit plans.

In the Social Security context, a treating physician's opinion is entitled to complete deference if it is totally uncontradicted. *Cohen v. HHS*, 964 F.2d 524, 528 (6th Cir. 1992) (citation omitted). Even where the treating physician's opinion is contradicted by other competent medical sources, it is still entitled to "great weight" so long as it is "supported by sufficient clinical findings and [is] consistent with the evidence." *Cutlip v. HHS*, 25 F.3d 284, 287 (6th Cir. 1994); *see also* 20 C.F.R. § 416.927(d)(2).

By contrast, the Supreme Court holds that the SSA treating physician rule does not apply to ERISA disability determinations. Unlike the SSA Commissioner, the Secretary of Labor has never exercised her authority to issue a regulation imposing such a rule. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830-31 (2003) (citations omitted). Thus, Unum was not *obligated* to accord Milek's opinion any greater weight than the opinions of examining or consulting physicians. *See Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 293-94 (6th Cir. 2005) (following *Black & Decker*).

The record reveals that substantial evidence supported Unum's decision to discount or discredit Milek's opinion, as well as portions of the Booth and Gaw opinions. *Cf. Wise v. Hartford Life & Acc. Ins. Co.*, No. A.1:04-CV-784, – F. Supp. 2d –, 2005 WL 3246330, at *11 (N.D. Ga. Dec. 1, 2005) ("By demonstrating that it chose to follow what it reasonably perceived as equally or more objectively reliable data in denying a claimant benefits, an ERISA administrator substantially ameliorates any fears that its decision was motivated by self-interest rather than by a good faith

effort to exercise its discretion to interpret and apply the plan.") (citation and internal quotation marks omitted).

First, Milek's failure to support his opinion with data or useful analysis is a sufficient reason to discount his opinion, even if he is a treating physician. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546 (6th Cir. 2004) (treating physician did not support conclusory statement that narcolepsy prevented claimant from doing even minimal sedentary work); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (substantial evidence supported rejection of bipolar-disorder diagnosis that "was not supported by clinical evidence and was based on [claimant]'s subjective complaints").

Second, as Gendron points out, the medical opinions were hardly consistent, providing a basis to doubt the alleged intensification in Creech's pain between May 2002 and January 2003:

> The new medical data from AP [attending physician] Dr. Booth is inconsistent with the newer evaluation by Dr. Gaw. . . . [D]uring Dr. Booth's evaluation 5/14/02, he noted the claimant's elbows were without tenderness. He noted no abnormalities with the right shoulder. Dr. Gaw, however, noted tenderness around the rotator cuff on the right with pain in the right shoulder against resistance . . . . [as well as tenderness in the upper extremities with pain during pronation, supination, dorsiflexion and palm flexion against resistance] These two evaluations are entirely inconsistent in terms of pain findings, particularly in an individual who reportedly is not performing any repetitive [activities with her] upper extremities, one would not understand how or why she would have developed such a diffuse pain syndrome between the time that she was evaluated by Dr. Booth 5/02 and when she was evaluated by Dr. Gaw 1/03.[12]

---

[12]*Cf. Harris v. Kemper Ins. Cos.*, 360 F. Supp. 2d 844, 849-50 (E.D. Mich. 2005) (substantial evidence supported insurer's rejection of treating neurosurgeon's opinion that herniated disc and mild compression of spinal cord prevented claimant from doing any work, in light of reviewing physicians' well-explained opinions that she could work in sedentary to light positions).

Third, Gendron pointed out that a comparison of Gaw's 2001 report and 2003 reports suggested that Creech's condition had improved in at least one significant respect:

> In comparing Dr. Gaw's prior independent medical evaluation while she was still working, Dr. Gaw at that time had documented atrophy of the right forearm muscles. However, he did not document any atrophy on subsequent follow-up in 1/03, and this resolution of the atrophy would suggest that the claimant's condition may have improved.

Fourth, Gendron provides some reason to doubt any implication that the tenderness in Creech's forearms had worsened after she stopped working, stating in his report that:

> As of 1/03, according to Dr. Gaw's note, she has tenderness at *more* sites in the forearms *than she did when she was working doing repetitive tasks* 4/00. Again, in the absence of performing repetitive upper extremity activities, one would have anticipated that the claimant's pain syndrome would have improved, and this improvement appears to be supported by Dr. Booth's clinical evaluation 5/02, which indicates that the claimant's elbows are without tenderness.

(Emphasis added.) Given that Creech had not engaged in repetitive hand/arm activities (such as keyboarding) since May 2000, it was not unreasonable to cast doubt on the notion that her symptoms would have worsened long after that. *Cf. Clemons v. Barnhart*, 322 F. Supp. 2d 687 (W.D. Va.) (upholding denial of benefits to claimant who suffered from neurotoxicity caused by exposure to solvents; "it is not unlikely that plaintiff's chemical sensitivity would have improved following termination of his exposure to toxic chemicals," i.e., since he stopped working at factory four years earlier), *aff'd*, No. 03-1247, 68 F. App'x 526 (4th Cir. July 21, 2003), *cert. denied*, 541 U.S. 948 (2004).

Therefore, Unum could reasonably find that Booth's May 2002 notes (stating that Creech's elbows were not tender) were more reliable and more reflective of Creech's true condition than

Gaw's January 2003 evaluation (stating that Creech experienced tenderness in more areas of her forearm than when she was working in April 2000). Moreover, even Gaw's January 2003 evaluation failed to find that Creech could not do occasional keyboarding and similar activities implicating her hands, wrists, and forearms; it found merely that she was restricted from doing such actions repetitively.

Fifth, Gendron reasonably notes that if Creech had developed more intense and widespread pain in her arms as suggested by Gaw's January 2003 evaluation, she would have undergone more active medical treatment. *Cf. Smith v. Ameritech*, 129 F.3d 857, 861 (6th Cir. 1997) (insurer's physician opined that claimant's "reluctance to pursue surgical treatment suggested that [he] does not find his discomfort so severe as to be intolerable or totally disabling.").

Sixth, Gendron infers that Creech's claims of pain and impairment are not credible because they are inconsistent with her observed use of her hands and arms. Namely, Creech claimed she had lost considerable gripping strength in her right hand, yet an interviewer saw her hold a cup in each hand without support from the other hand, lift a small dog, and use her hands in an animated fashion while speaking. Creech also admitted that she dusted, did laundry, and folded clothes, activities that were arguably inconsistent with her complaints. Gendron opined that "[t]hese inconsistencies in her stated capacity vs. her observed capacity negatively impact the claimant's credibility." We cannot say as a matter of law that it was arbitrary to draw such adverse inferences about Creech's credibility regarding the extent of her pain and limitations.

Thus, this is not a case where the insurer simply ignored medical opinions contrary to the outcome it wished to reach. Nor did Unum characterize those opinions as unreliable without

pointing to specific flaws. Unum adduced affirmative evidence in support of its determination, and it made sufficiently detailed, cogent criticisms of the contrary opinions and findings. Unum could reasonably be struck by the contrast between Gendron's arguably sound reasoning and Milek's failure to proffer specific findings to justify his own revised opinion.

Creech maintains that the substance of Milek's assessment of her condition did not change. Rather, she claims that Milek changed his statement of her residual functional capacity because his earlier, more optimistic assessments were based on a misunderstanding of how Unum used various terms. Unum could have chosen to believe that explanation and credit Milek's revised assessment. But we cannot say that it was arbitrary for Unum to go the other way and conclude that Milek was simply trying to help his long-time patient get benefits. Just as a physician paid by an insurer may strain to find no disability, "treating physicians may have strong pro-claimant biases." *Eastover Mining Co. v. Williams*, 338 F.3d 501, 510 (6th Cir. 2003).

Especially given the impression that Milek changed his assessment to help Creech, Unum was permitted to credit other opinions over his. "Generally, when a plan administrator chooses to rely on a medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious . . . ." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003).

In sum, even when we consider the conflict of interest inherent in Unum's dual role, we conclude that its assessment of Creech's residual functional capacity was not arbitrary and capricious. *Cf. Gismondi v. United Tech. Corp.*, 408 F.3d 295, 299 (6th Cir. 2005) ("It is clear that

even when we consider the conflict of interest as a factor in our standard of review, we have no choice but to conclude that United Technologies's denial of benefits survives the plaintiffs' challenge because the interpretation of 'discharge' is a rational interpretation of the terms of the retirement plan.").

Independent of their debate over the degree of impairment caused by Creech's condition, the parties disagree over Creech's job skills and qualifications. Unum found Creech qualified for three jobs that met the threshold established by her prior salary: department manager, customer-complaint clerk, and contract administrator.[13] Unum based this decision on a Transferable Skills Analysis ("TSA") done by Genex.

Genex based *its* TSA, however, on the information Unum provided about Creech's job at Willis. Namely, Unum told Genex that Creech had been employed as a Risk and Insurance ("R&I") Manager. Creech characterizes R&I Manager as "a senior executive-level position." Creech contends that her position as Senior Client Manager was merely a staff-level position and did not remotely entail the responsibilities and skills of a R&I Manager. Whether one denominates these positions as "executive" or "staff-level," Unum provides no basis for giving Genex information that was at best inaccurate and at worst deliberately misleading.

It is true that Unum did not give Genex only the R&I Manager description. Unum also provided Willis's description of Creech's actual position, Senior Client Manager, and Creech's own description of her education and employment history. The district court states, "[t]hus, it appears

---

[13]Unum found Creech qualified for three other jobs, too, but they either required more than occasional keyboarding or did not pay enough.

that Genex had both Willis's definition of the Senior Client Manager position and the Risk and Insurance Manager job description, to which [vocational rehabilitation counselor] Wallace found the actual job requirements most closely analogized, in its assessment of Creech's transferable skills."

This begs the question, was there substantial evidence to support Unum's determination that Creech's job duties were closely analogous to those of an R&I Manager? We find that there was not.

First, we cannot say that Unum's inclusion of the inapposite R&I Manager description did not materially influence Genex's TSA, or that Genex would have found Creech qualified for the same jobs even if it had not considered that description. Genex expressly relied on the R&I job description. Genex did not merely proceed on the assumption that Creech's job involved duties analogous to those of an R&I Manager; it proceeded on the belief that she *already was* an R&I Manager. The Overview section of the TSA states, "Ms. Creech is a 57-year-old female (DOB: 5/08/45), *employed by Willis of Tennessee as a Risk and Insurance Manager.*" The TSA's Work History section states, in its entirety: *"Ms. Creech's work history consists of the following: Occupation-Risk and Insurance Manager*; DOT Code 186.117-066; SVP-8; Years-28 yrs. 7 mos.; Physical Level-S; Salary $45,304.60 per yr." *Id.* (emphasis added). Immediately thereafter is the TSA's Transferable Skills section, which states:

> *The preceding job* [R&I Manager] is classified as skilled by the DOT. The skills associated with the position are in the field of Any Industry. The skills acquired include the following:

> 11.06 Finance

> Apply mathematical knowledge and principals [sic] of accounting and auditing to design and analyze financial record-keeping systems.
>
> Estimate value of real estate, personal or other property, including materials and equipment.
>
> Plan, organize, and direct the work of others.
>
> Speak and write clearly to communicate financial data.
>
> Apply math skills or computer technology to solve numerical problems speedily and accurately.

(Emphasis added.) Neither Willis's job description for Creech's Senior Client Manager position nor Creech's own description of her job duties supports the finding that she can plan, organize, and direct the work of others. Willis described the Senior Client Manager position as involving the following duties:

> **Senior Client Manager**
> Responsible for maintaining relationship with client decision makers. Answer client policy and coverage questions. Consult with clients on mid-term policy changes. Provide monthly reporting of client values to carriers. Coordinate and conduct claims review meetings for selected accounts. Visit client site to identify potential exposures and needs: review loss analysis, complete risk management analysis. Work with producers to complete action steps [sic] necessary to close renewal. Assist in gathering and researching risk management/insurance information from prospects. Assist in resolving client billing questions[.]

By contrast, Unum describes R&I Manager as involving higher-level supervisory duties that do not appear to have a counterpart in the senior client manager role:

> 1. Analyzes and classifies risks as to frequency and potential severity, and measures financial impact of risk on company.
>
> 2. Selects appropriate technique to minimize loss, such as avoidance (reducing chance of loss to zero), loss prevention and reduction (reducing frequency and severity of loss), retention (including self-insurance and planned non-insurance),

grouping of exposure units (to increase predictability of loss), and transfer (placement of property, activity, or risk with other establishment or insurers).

3. *Directs insurance negotiations, selects insurance brokers and carriers*, and places insurance.

4. *Appoints claims and self-insurance administrators, and allocates program costs.*

5. Prepares operational and risk reports for management analysis.

6. *Manages insurance programs, such as fidelity, surety, liability, property, group life, medical, pension plans, and workers' compensation.*

**May Also Include:**
1. May *direct* loss prevention and safety programs.

2. May *select and direct activities of safety, engineering, and loss prevention experts.*

3. May *negotiate with unions for employee benefits.*

(Emphasis added.)

In Unum's behalf, Creech's licenses as a property and casualty insurance agent and surety bond agent could give her some skill and experience at estimating the value of real property. But there are numerous areas where Creech's duties are not comparable to those of a R&I Manager. For one thing, so far as the record reflects, Creech did not supervise any other employees in her position as Senior Client Manager; the only possible oblique reference to supervision is the phrase "Coordinate and conduct claims review meetings for selected accounts," and Unum does not explain how this entails supervision. Nor is there any basis to conclude that Creech has the ability to *hire and supervise* safety, engineering, and loss-prevention experts. In addition, Creech may have

negotiated insurance terms and prices with customers, but that does not equate to expertise in collective bargaining, i.e., negotiating with unions for employee benefits.

Perhaps most telling is the original opinion of Unum's own Rehabilitation Counselor, Wallace. In January 2001, Wallace analogized Creech's position to that of claims adjuster. By two critical measures – Specific Vocational Preparation (SVP) and General Educational Development (GED) – the Dictionary of Occupational Titles treats claims adjuster as a lower-level position than R&I Manager.

SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DICTIONARY OF OCCUPATIONAL TITLES app. C ¶ II (4th ed. 1991). The requisite time is ranked on a scale from one to nine, with nine representing the most time needed to learn a job. The position of claims adjustor/representative has an SVP level of seven, meaning that it takes the average worker "[o]ver 2 years up to and including 4 years" to learn. *Id.* By contrast, the position of R&I Manager has a SVP level of eight, meaning that it takes the average worker "*[o]ver four years up to and including ten years"* to learn. (Emphasis added.)

The Dictionary also rates each job's required General Educational Development, or GED, in three areas: Reasoning Development ("R"), Mathematical Development ("M"), and Language Development ("L"). Both positions require a reasoning skill level of five. To be an R&I Manager, however, one must possess level four math skills, compared to only level three for claims adjustor. *See* Info. Technology Assocs., http://www.occupationalinfo.org/24/241217010.html (Claim Adjustor) and http://www.occupationalinfo.org/18/186117066.html (R&I Manager).

- 25 -

In light of these material differences between the duties of the two positions, it is not tenable for Unum to claim Creech could work as a R&I Manager because she "had to possess . . . a thorough understanding of all aspects of the Risk and Insurance Manager's Responsibilities" because her job as Senior Client Manager entailed managing Willis's relationships with R&I Managers. At best, familiarity with a R&I Manager's duties might make it somewhat easier or quicker for Creech to study or train *to eventually become* a R&I Manager; but such familiarity does not equate to a present ability to perform those duties. One may become familiar with the nature of the duties of higher-level jobs, but it does not mean he could step into such a job and perform competently.

In short, it was arbitrary for Unum to characterize Creech's job duties as equivalent or closely analogous to those of a R&I Manager, let alone to tell Genex (or allow Genex to labor under the misapprehension) that she already *was* a R&I Manager. In turn, it was arbitrary and capricious for Unum to deny "any occupation" benefits in reliance on a TSA it knew was inaccurate.

## IV.

For the foregoing reasons, we reverse the denial of benefits and remand this case to the district court. The district court shall order Unum to pay Creech disability benefits from the date on which the policy's "any occupation" period began through the present. It is for the district court, in the first instance, to determine whether Unum should pay prejudgment interest, fees, and costs.