RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0425p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DINEEN JORDAN,

*Plaintiff-Appellant,*

v.

COMMISSIONER OF SOCIAL SECURITY,

*Defendant-Appellee.*

No. 07-5876

>

---

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 06-01104—James D. Todd, District Judge.

Submitted: October 28, 2008

Decided and Filed: November 25, 2008

Before: MARTIN and GILMAN, Circuit Judges; DOWD, District Judge.[*]

---

## COUNSEL

**ON BRIEF:** Janice E. Barnes-Williams, OFFICE OF THE GENERAL COUNSEL, SOCIAL SECURITY ADMINISTRATION, Kansas City, Missouri, for Appellee. Dineen Jordan, Brownsville, Tennessee, pro se.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. Dineen Jordan suffered an on-the-job back injury in 1991. She filed an application for Social Security disability benefits 12 years later, claiming that she could not work because she suffered from back pain and fibromyalgia as a result of the 1991 injury. An Administrative Law Judge (ALJ) found that her complaints of impairment were not credible. The ALJ specifically relied on the opinions of two physicians who stated that Jordan was exaggerating her symptoms, one of whom had watched surveillance videos showing that Jordan was functioning with no signs of debilitation. In addition, the ALJ concluded that, while Jordan could not perform the duties of her old job, there were a wide variety of light-duty jobs available to her. Jordan was thus found not to be disabled for Social Security purposes. Her request for review was subsequently denied by the Appeals Council of the Social Security Administration (SSA), which caused Jordan to file a civil action in the federal district court.

---

[*]The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

The district court issued an order affirming the SSA's decision, holding that the ALJ's opinion was supported by substantial evidence. Because we conclude that the ALJ lacked sufficient evidence to make a finding regarding Jordan's future job prospects, we **VACATE** the judgment of the district court with instructions to **REMAND** the case to the SSA for further proceedings consistent with this opinion.

## I. BACKGROUND

### A.    Factual background

Jordan was born in March 1961 and is a high school graduate. She completed a number of college courses but did not receive a degree. On April 8, 1991, while working for the United States Postal Service as a mail handler, Jordan experienced severe back pain after lifting a heavy sack of mail. She was taken to the emergency room, where she was x-rayed and diagnosed with a paraspinous muscle sprain and discharged with a prescription for muscle relaxants and instructions to maintain bed rest.

Shortly thereafter, Jordan was seen by Dr. Richard Barse, an internist. Based on x-rays that showed no fractures, Dr. Barse determined that Jordan had suffered a lumbrosacral strain. He directed Jordan to undergo two weeks of physical therapy and referred her to Dr. Dario Nolasco, an orthopedic surgeon. Upon examining Jordan, Dr. Norlasco confirmed Dr. Barse's diagnosis of a lumbrosacral sprain and prescribed bed rest. After a July follow-up appointment, Dr. Norlasco found Jordan to be recovering well and released her for light-duty work, with a lifting restriction of 20 pounds.

Jordan returned to work in a limited-duty assignment. Her duties included taking the bands off of bundled mail and sorting letters with the use of trays that were located above her head. She stopped working in September 1991 due to a recurrence of pain in her lower back, buttocks, and left leg. On October 14, 1991, Dr. Norlasco performed a magnetic resonance imaging (MRI) scan on Jordan that revealed disc protrusions at two levels, as well as degenerative changes at the L5-S1 disc space.

Jordan never returned to work after the recurrence of pain in 1991. She saw numerous doctors over the following years in connection with her workers' compensation claim and, significantly later, with her Social Security disability claim. The following doctors opined that Jordan was completely unable to work: Dr. Thomas Arkins (a neurosurgeon), Dr. Robert McConnell (whose specialty is not specified in the record), Dr. William Massey (a general practitioner), Dr. Stuart Belkin (an orthopedic surgeon), Dr. Mary Anne Rodriguez (whose specialty is not specified in the record), and Dr. Robert Winston (an internist). Jordan also saw a urologist, Dr. Arnold Baskin, in 1993 for incontinence. Dr. Baskin opined that the incontinence was likely related to the 1991 back injury.

But not all of the doctors who examined Jordan opined that she was totally disabled. Dr. John Shine, an orthopedic surgeon, examined Jordan in 1993 and concluded that Jordan could not return to her usual job, which involved heavy lifting. He opined, however, that she would be able to do very light-duty work, perhaps on a part-time basis.

Dr. Stephen Waggoner (whose specialty is not specified in the record) performed an independent medical examination on Jordan in August 2001. Dr. Waggoner noted that Jordan showed "obvious signs of symptom magnification with 5/5 Waddell signs [a clinical test for patients with low back pain that can be used to indicate whether the patient is exaggerating symptoms] positive." When Jordan got out of her wheelchair for the examination, she grimaced and trembled, but when she did not think that Dr. Waggonner was looking, she moved out of the wheelchair with ease. Dr. Waggonner made the following diagnoses based on his examination: (1) degenerative disc

disease with chronic lower back pain, (2) no clinical evidence of lumbar radiculopathy, and (3) clinical evidence of symptom magnification. In conclusion, Dr. Waggoner opined that Jordan would be able to lift 25 to 50 pounds and that she had no permanent partial impairment.

Finally, Dr. Carl Huff, an orthopedic surgeon, saw Jordan for an independent medical examination in August 2002. Dr. Huff performed a detailed review of Jordan's prior medical records, including x-rays, MRI scans, and nerve conduction/EMG needle studies. Jordan's lumbar spine x-rays from 2001 were negative. Her MRI results showed degenerative disc changes at three levels and central disc protrusions at two levels, but revealed no evidence of nerve root impingement. The nerve conduction/EMG needle studies, which had been performed in 2002, were negative, showing no evidence of radiculopathy, peripheral nerve entrapment, or myelopathy.

Dr. Huff also performed a physical examination. He could find no objective manifestation of any mechanical dysfunction of Jordan's back. Jordan frequently exhibited pain responses that were inconsistent with any underlying physiological conditions. For example, when Dr. Huff lightly stroked the skin of her lower back area or applied mild pressure to the top of her head, such that no force was actually transmitted to the spine, Jordan reacted with "an extreme response of pain with grimacing, verbal response, and withdrawal gestures." Jordan also exhibited an exaggerated pain response to twisting motions that involved no relative movement of the thoracolumbar spine. When Dr. Huff extended Jordan's leg at 90 degrees of elevation during an ankle reflex test, she reported no pain. But when Dr. Huff later lifted her leg in the same manner during another type of test, Jordan cried out and made pronounced physical and verbal gestures.

As part of his consultation, Dr. Huff also reviewed three video surveillance tapes of Jordan taken in 2001. One video showed Jordan carrying and tossing around tree limbs in her yard in a relaxed manner. A second video recorded Jordan coming out of a store carrying a sack of merchandise with no difficulty, easily getting into her car, and driving away. The third video showed Jordan coming out of a Gold's Gym without showing any manifestation of back pain. Dr. Huff also reviewed a written note from a trainer at the gym, who stated that Jordan visited the gym with regularity, using the treadmill and bicycle.

Dr. Huff's report stated that he was "unable to establish any residuals of the injury of 4/8/91. Her MRI scan reports have remained remarkable [sic] stable over the years . . . ." Dr. Huff noted that all five "Waddell's Signs" were positive and that there was no physiological basis for Jordan's complaints about her back. In conclusion, Dr. Huff stated that Jordan had "no work restrictions."

## B.     Procedural background

Jordan applied to the SSA for disability insurance benefits on March 20, 2003. Her long delay in applying for disability benefits was presumably related to her receipt of workers' compensation benefits in the interim, although the record is silent in this regard. The parties do not dispute that Jordan was insured for disability benefits through December 31, 1996, but not thereafter. A hearing before an ALJ was held on November 4, 2004 in Jackson, Tennessee.

Jordan testified at the hearing that she had the following medical problems: three ruptured discs; degenerative joint disease; swollen ankles; neck, shoulder, and arm pain; severe headaches; hypertension with an accelerated heartbeat; acid reflux disease; stomach pain; diarrhea; incontinence; and depression. She also stated that she had trouble walking, could not sit for long periods of time, and had been prescribed antidepressants. Jordan further testified that, because of her disability, she was no longer able to enjoy dancing, gardening, going to the movies with her daughter, or going to church.

The ALJ determined that Jordan was not disabled. In his decision, the ALJ found that Jordan was insured for benefits through December 31, 1996, and that she had not worked since her alleged disability date in September 1991. The ALJ also found that Jordan's degenerative lumbar disc disease was a severe impairment, but not so severe that it met or equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, Regulations No. 4, which would have dictated an automatic ruling of "disabled." He further found that there was no medical evidence that Jordan suffered from any of her other claimed impairments—fibromyalgia, incontinence, depression, etc.—during the period when she was insured.

Finally, the ALJ determined that Jordan's subjective complaints were not fully credible. He placed particular weight on the report of Dr. Huff. The report concluded that Jordan was exaggerating her symptoms, and it discussed the video and eyewitness evidence showing that Jordan in fact appeared to be fully functional. Jordan was also found to have the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; to sit, stand, or walk for six hours in an eight-hour workday; to occasionally balance, stoop, kneel, crouch and crawl; but that she should never climb ladders, ropes, or scaffolds. The ALJ accordingly reasoned that Jordan was unable to perform her past relevant work, but had the residual functional capacity to perform a significant range of light work. Due to Jordan's residual functional capacity, the ALJ found that the Social Security Medical-Vocational Guidelines (commonly referred to as the "grids") directed a finding of "not disabled." The ALJ thus concluded that Jordan was not entitled to disability benefits at any time on or before December 31, 1996. The SSA's Appeals Council denied Jordan's request for review on January 27, 2006, making the ALJ's ruling the final decision of the SSA.

Jordan then filed a timely pro se civil action in the United States District Court for the Western District of Tennessee, seeking a reversal of the ALJ's findings. The district court affirmed the ALJ's decision. *Jordan v. Astrue*, No. 1:06-cv-1104-JDT, Doc. No. 17 (W.D. Tenn. June 6, 2007). While acknowledging that the opinions of treating physicians must be given great weight when supported by sufficient medical evidence, the court found that substantial evidence supported the ALJ's determination that, prior to December 31, 1996, Jordan had no limiting impairments other than degenerative disc disease. The court also concluded that the ALJ did not err in his determination that Jordan's testimony regarding the extent of her limitations lacked credibility, especially in light of Dr. Huff's report. Next, the court found that the ALJ properly relied upon the functional-capacity assessments by the SSA's medical consultants in determining that Jordan was capable of performing a significant range of light work. Finally, the court concluded that the ALJ had properly used the grids as a framework for his conclusion that Jordan was not disabled on or prior to December 31, 1996. *Id.* This timely pro se appeal followed.

## II. ANALYSIS

### A.      Standard of review

We exercise de novo review of district court decisions in Social Security cases. *Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 390 (6th Cir. 2005). The Commissioner's conclusions must be affirmed absent a determination that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *see also Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). Accordingly, we "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984).

**B.      The ALJ's factual determinations were supported by substantial evidence**

We have no doubt that the ALJ relied on "substantial evidence" to reach his determination. Most damning is the video evidence showing that Jordan, who claims to now be "even more disabled" than she was during the relevant, pre-1997 period, appears to be anything but. This impression is supported by the conclusions of two consulting physicians, Drs. Waggoner and Huff, who examined Jordan and found no objective basis for her purported physical restrictions. Both doctors were confident that Jordan was substantially exaggerating her symptoms. The opinions of the ALJ and the district court provide a thorough discussion of the adequacy of the evidence; there is little that we could add on the issue that would not be redundant. Our analysis focuses instead on the ALJ's reliance on the SSA's grids in reaching his conclusion that Jordan could perform a wide variety of light-duty jobs, and was accordingly not disabled.

**C.      The ALJ's reliance on the SSA grids**

ALJs are required to perform the following five-step analysis to determine whether a claimant is disabled within the meaning of the Social Security Act:

> 1.  If the claimant is doing substantial gainful activity, she is not disabled.
>
> 2.  If the claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.
>
> 3.  If the claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.
>
> 4.  If the claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.
>
> 5.  Even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). During the first four steps, the claimant has the burden of proof; the burden shifts to the SSA only for the fifth step. *Id.* The SSA's burden at the fifth step is to prove the availability of jobs in the national economy that the claimant is capable of performing. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999). An ALJ is to employ the grids, found at 20 C.F.R. Part 404, Subpart P, Appendix 2, at the fifth step of the disability determination, after the claimant has been found not to meet the requirements of a listed impairment but to nevertheless be incapable of performing past relevant work. *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990). The claimant, however, retains the burden of proving her lack of residual functional capacity. *Her*, 203 F.3d at 392.

Different evaluative frameworks apply to claimants with exertional and nonexertional limitations. The SSA defines the two terms as follows:

> Exertional limitations. When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling), we consider that you have only exertional limitations.

Nonexertional limitations. [] When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the demands of jobs other than the strength demands, we consider that you have only nonexertional limitations or restrictions. Some examples of nonexertional limitations or restrictions include the following:

. . .

> (vi) You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching.

20 C.F.R. § 404.1569a(b) and (c).

In this case, Jordan alleges that she has a combination of exertional and nonexertional limitations. As determined by the ALJ, Jordan's exertional limitations include the inability to (a) lift more than 20 pounds on an infrequent basis; (b) lift more than 10 pounds on a frequent basis; and (c) sit, stand, or walk for more than six hours in an eight-hour workday. The only allegations of nonexertional limitations that the ALJ found credible were Jordan's occasional postural limitations and her inability to climb ladders, ropes, or scaffolds.

Relying on the grids, the ALJ found a significant variety of light-duty jobs available to Jordan despite her exertional and nonexertional limitations. He accordingly concluded that she was not entitled to disability benefits. Aside from the grids, the only other evidence that the ALJ used to reach this conclusion was Social Security Ruling (SSR) 85-15, which he cited as support for his determination that Jordan's limited ability to balance, stoop, kneel, crouch, crawl, and climb "[would] not significantly reduce the occupational base at the light level . . . . Thus, with all her postural restrictions, [Jordan] is still capable of making a vocational adjustment to a significant number of jobs in the national economy." But SSR 85-15 focuses on claimants with mental impairments and explicitly states that it applies to claimants with solely nonexertional impairments. 1985 SSR LEXIS 20, at *1 (1985). Because Jordan also has exertional limitations, the ALJ should have instead applied SSR 83-14. That Ruling provides in relevant part as follows:

> A particular additional exertional or nonexertional limitation may have very little effect on the range of work remaining that an individual can perform. The person, therefore, comes very close to meeting a table rule which directs a conclusion of "Not disabled." On the other hand, an additional exertional or nonexertional limitation may substantially reduce a range of work to the extent that an individual is very close to meeting a table rule which directs a conclusion of "Disabled."

> Use of a vocational resource may be helpful in the evaluation of what appear to be "obvious" types of cases. In more complex situations, the assistance of a vocational resource may be necessary.

1983 SSR LEXIS 33, at *9-10 (1983).

We have held that the SSA may not rely on the grids alone to meet its step-five burden where the evidence shows that a claimant has nonexertional impairments that preclude the performance of a full range of work at a given level. *Abbot v. Sullivan*, 905 F.2d at 926-27; *Damron v. Sec'y of Health and Human Servs.*, 778 F.2d 279, 282 (6th Cir. 1985). Normally, where a claimant suffers from an impairment limiting only her strength (i.e., exertional limitations), the SSA can satisfy its burden through reference to the grids without considering direct evidence of the availability of jobs that the particular claimant can perform. We cautioned in *Abbott*, however, that where a claimant suffers from *nonexertional* limitations that significantly restrict the range of available work, "rote

application of the grid is inappropriate." *Abbott,* 905 F.2d at 926. Noting that the grids take account of only exertional limitations (as contrasted with SSR 85-15, which accounts for only *non*exertional limitations), we held that an ALJ cannot rely on the grids alone in cases where the claimant's nonexertional limitation "significantly restrict[s] the range of available work." *Id.* at 926-27. In *Damron*, 778 F.2d at 281-82, we found that the ALJ, who had relied solely on the grids, "completely failed to consider the effect of nonexertional limitations upon [the claimant's] ability to find work in the national economy."

*Abbott* and *Damron* reflect the general rule in this circuit that, where a claimant has nonexertional impairments alone or in combination with exertional limitations, the ALJ must treat the grids as only a framework for decisionmaking, and must rely on other evidence to determine whether a significant number of jobs exist in the national economy that a claimant can perform. *Burton v. Sec'y of Health & Human Servs.*, 893 F.2d 821, 822 (6th Cir. 1990). "Reliance upon the grids in the presence of nonexertional limitations requires reliable evidence of some kind that the claimant's nonexertional limitations do not significantly limit the range of work permitted by [her] exertional limitations." *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

In this case, the ALJ relied solely on the grids (which consider only exertional limitations) and SSR 85-15 (which considers only nonexertional limitations) to reach the conclusion that a wide range of light work was available to Jordan. The SSA argues on appeal that SSR 85-15 constituted the necessary "reliable evidence" that Jordan's nonexertional limitations did not significantly limit her ability to perform light work. But SSR 85-15 does not apply to Jordan, who suffers from both exertional and nonexertional limitations. Accordingly, it could not have constituted reliable evidence in support of the ALJ's finding. Because the ALJ relied only on the grids and a facially inapplicable Social Security Ruling, he erred in finding the availability of other work for Jordan. *See Shelman*, 821 F.2d at 321. The case must therefore be remanded to the ALJ for the consideration of evidence other than the grids. Specifically, the ALJ may wish to hear testimony from a vocational expert regarding the range of jobs available to Jordan, as contemplated by SSR 83-14.

## III. CONCLUSION

For all of the reasons set forth above, we **VACATE** the judgment of the district court with instructions to **REMAND** the case to the SSA for further proceedings consistent with this opinion.