**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0489n.06

**No. 09-5924**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Jul 15, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| WYVONNIA BROOKS, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **O P I N I O N** |
| | ) | |
| Defendant - Appellee. | ) | |
| _____ | ) | |

**Before: GILMAN and WHITE, Circuit Judges; and WATSON[*], District Judge.**

**HELENE N. WHITE, Circuit Judge**. Plaintiff-Appellant Wyvonnia Brooks appeals from

the district-court order affirming the decision of the Commissioner of Social Security denying

Brooks's claim for disability insurance benefits and supplemental security income. For the reasons

set forth below, we REVERSE the judgment of the district court and REMAND to the agency for

thorough consideration of the entire record.

**FACTS AND PROCEDURAL BACKGROUND**

In May 2004, Brooks filed applications for disability insurance benefits and supplemental

security income payments for the period beginning December 20, 2003, based on severe carpal

tunnel syndrome in both hands and degenerative disc disease in her neck.

_____

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District
of Ohio, sitting by designation.

A.    *Medical Records*

In September 2003, Brooks was working as a certified nurse technician when she injured herself moving a patient. Brooks was treated at the Baptist Hospital emergency room for pain and numbness in her left shoulder, wrist, and hand. A cervical spine x-ray showed "degenerative changes" at the C5-6 level with "disc space narrowing and anterior osteophyte formation." Ten days later, Brooks underwent an MRI, which revealed "minimal central posterior disc bulges at C4-5 and C5-6." The MRI report concluded that Brooks had "[m]inimal spondylotic change at C4-5 and C5-6."

Although Brooks apparently did not complain about her neck, shoulder, or back to her primary care physician, Dr. Salil Roy, during a December 2003 visit, Brooks had been seeing another physician, Dr. Karl Fournier, during that time for "neck pain and numbness of both upper extremities." On January 20, 2004, Dr. Fournier noted that "She has not improved very well with her cervical spine. I told her there is no[t] much else we can [do] as far as her neck pain. She is going to have to learn to live with it because there is not enough to do surgery and I decided not to do any discogram of her cervical spine because I do not think she will do well with surgery which might involve up to three levels if we do it because she has degenerative discs in her cervical spine like a lot of people in her age range."

Dr. Fournier also diagnosed Brooks with carpal tunnel syndrome in both upper extremities, noting (based on nerve conduction studies) that it was more severe on the right side, but that Brooks had more symptoms on the left. Dr. Fournier had Brooks wear splints at night and work "on light duty with no lifting more than 20 pounds, no repetitive twisting, no repetitive bending." The splints

did not work well and in February 2004 Dr. Fournier referred Brooks to a hand-surgery specialist, Dr. Barry Callahan. Dr. Fournier maintained Brooks's work restrictions.

Dr. Callahan saw Brooks in February 2004. In his physical-exam notes, Dr. Callahan wrote that Brooks had a positive Phalen's test, positive Tinel's test, and a positive median-nerve-root-compression test on both her left and right hand and wrist.[1] Dr. Callahan also noted that Brooks was obese. He recommended that Brooks undergo carpal-tunnel release surgery on both sides. In April 2004, Dr. Callahan examined Brooks and again recommended surgical release.

Brooks sought an additional opinion with regard to her symptoms, and saw Dr. Douglas Weikert in May 2004. According to Dr. Weikert's notes, Brooks reported pain in her left and right arms and discomfort in her back and neck. Dr. Weikert diagnosed her with "bilateral right greater than left, chronic advanced carpal tunnel syndrome" and, like Dr. Callahan, recommended surgical release. Dr. Weikert opined that Brooks's carpal-tunnel syndrome developed gradually over the years and that her "morbid obesity" was a risk factor in the development of the disease. He restricted Brooks to lifting no more than ten pounds and asked her to limit repetitive pushing and pulling.

Brooks underwent a surgical carpal-tunnel release on her right hand on June 3, 2004, and on her left hand on June 29, 2004. In an August 2004 visit to Dr. Weikert, Brooks complained of left shoulder pain and some locking of her right ring finger, along with "some generalized pain,

_____

[1] A Tinel's Sign is "a tingling sensation ['pins and needles'] in the distal end of a limb when percussion is made over the site of a divided nerve" that is indicative of "a partial lesion or the beginning regeneration [sic] of the nerve," and a Phalen's test "involves reducing the size of the carpal tunnel by holding the hand straight, with the wrist fully flexed or extended, for 30 to 60 seconds." *Creech v. UNUM Life Ins. Co. of North America*, 162 F. App'x 445, 450 n.8 (6th Cir. 2006).

numbness and tingling in her fingers." Dr. Weikert noted that Brooks had well-healed incisions, and "good capillary refill, intact light touch sensation, and a negative Phalen's test in both hands." Dr. Weikert restricted Brooks to lifting 10 pounds or less occasionally, but noted that "she should be nearing a point where she can work without restrictions soon."

On September 12, 2004, Dr. Celia Gulbenk, a non-examining medical consultant for the State Disability Determination Services (DDS), assessed Brooks's physical residual functional capacity (RFC). Dr. Gulbenk listed morbid obesity as her primary diagnosis and carpal-tunnel syndrome as her secondary diagnosis. In the section of the RFC assessment form entitled "Exertional Limitations," Gulbenk checked boxes denoting that Brooks could 1) occasionally lift and/or carry 50 pounds, 2) frequently lift and/or carry 25 pounds, 3) stand and/or walk about 6 hours in an 8-hour work day, 4) sit about 6 hours in an 8-hour work day, and 5) push and/or pull without limitations. Dr. Gulbenk recommended no postural, environmental, or manipulative limitations. "No manipulative limitations" means Brooks is not limited in 1) reaching in all directions (including overhead), 2) handling, 3) fingering, and 4) feeling. In the section of the form where Dr. Gulbenk was directed to explain how the evidence supports her conclusions, she noted Brooks's September 2003 MRI as showing minor spondylitis and "no other abnormalities." Dr. Gulbenk also noted "Severe CTS [carpal-tunnel syndrome], expected to improve to nonsevere by 12 months [after] AOD [alleged onset date]; pain is expected to subside." Dr. Gulbenk also noted "No evidence of any severe neck D/O [disorder]."

Brooks saw Dr. Weikert on September 20, 2004. He noted that Brooks complained of "intermittent numbness and tingling, wrist pain as well as neck and shoulder pain." Brooks had a negative elbow-flexion test and a negative Phalen's test. Dr. Weikert ordered a repeat nerve-

conduction study and gave Brooks work restrictions limiting any lifting to 20 pounds and limiting grasping and pushing and pulling to less than 50% of the day.

On October 26, 2004, Brooks underwent the repeat nerve-conduction study ordered by Dr. Weikert. In the conclusions section of the report, Dr. Robert Clendenin stated:

> Abnormal study. There is electrodiagnostic evidence of moderate carpal tunnel syndrome bilaterally. There is no acute denervation present. The median latencies are much improved on comparison with the pre-op studies. The persistent slowing is most likely a remnant from the previous cts [carpal tunnel syndrome] and not a new acute syndrome. If her symptoms persist repeat median conductions would be useful to rule out a worsening or acute cts.

Brooks next saw Dr. Weikert on November 1, 2004. Dr. Weikert noted that Brooks "is complaining today of some left upper extremity, neck, and shoulder pain." Dr. Weikert compared Brooks's pre-surgery nerve study with her October 2004 study: "Preoperatively, her electrical studies revealed a motor latency of 9 on the right and 5 on the left. Postoperatively, her electrical studies are 4.92 on the right and 4.45 on the left." After examining Brooks, Dr. Weikert opined that she had reached maximum medical improvement and retained 4% impairments to both upper extremities. With regard to work restrictions, Dr. Weikert limited Brooks to occasionally lifting between 11 and 25 pounds, and directed that she should abide by that restriction until her next visit three months later. Dr. Weikert wrote that he "would expect this weight-lifting limit to be not permanent after the next visit," and "suggested that if her neck and shoulder pain appears to be worsening, then she should consider having this evaluated."

Brooks saw Dr. Weikert again on February 7, 2005. Brooks complained that her left shoulder was "killing" her. Brooks also complained that her right ring finger would get "stuck" while straightened and that she had pain in both wrists, discomfort in her forearms, and intermittent

tingling. Dr. Weikert noted that Brooks had a negative Phalen's test, but also noted that she had left shoulder pain during a supraspinatus stress test, and that her AC [acromioclavicular] joint was tender and her trapezium was painful along the anterior margin. Dr. Weikert concluded again that Brooks had reached maximum medical improvement as to her carpal-tunnel releases, and removed the lifting limitations he had previously put in place, leaving Brooks with no restrictions. Dr. Weikert discharged Brooks, stating, "I have nothing further to add to her care."

On February 22, 2005, Brooks returned to her primary care physician, Dr. Roy. Dr. Roy noted "tenderness cervical spine (C5 – C7); pain left shoulder – spasm; pain both wrists." Dr. Roy also noted that Brooks was "not working now" and was "running out of TennCare." Dr. Roy continued to be treat Brooks through at least May 2006; the record shows that Brooks saw Dr. Roy 17 times. In those visits, Brooks complained of left shoulder pain at least eight times, and of restricted movement of her left shoulder seven times. Dr. Roy also noted that Brooks reported pain and sometimes stiffness in both hands and wrists, a weak grip with her left hand, and pain in her neck.

Dr. Roy at one point referred to Brooks's left-arm pain as "bursitis," and consistently prescribed 800 milligrams of ibuprofen. At one point, Brooks apparently experienced relief with the ibuprofen. However, notes from later appointments show that she subsequently complained of pain in her left shoulder and wrist. In a March 2006 appointment, Brooks's left shoulder range of movement was apparently "improved." However, in April 2006 she complained of "drawing" of

her left arm. By May 2006, Roy noted an "increased range of movement." He also discontinued the ibuprofen and substituted Tylenol.[2]

On April 24, 2006, Dr. Roy filled out a form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." Under the category of exertional limitations, Dr. Roy reported that 1) Brooks could occasionally lift less than ten pounds, 2) Brooks could stand or walk less than 2 hours in an 8-hour work day, 3) Brooks could sit less than 6 hours in an 8-hour work day, and 4) Brooks was limited in upper extremities in that she could only push or pull up to 90 degrees with her left shoulder. In support of these conclusions, Dr. Roy wrote, "Has bursitis affecting left shoulder; Limited movement of the left shoulder; Neuropathic pain left shoulder[.]" With regard to postural limitations, Dr. Roy checked boxes indicating that Brooks could never climb, kneel, crouch, or crawl. With regard to manipulative limitations, Dr. Roy checked boxes indicating that Brooks was limited in the categories of reaching in all directions and fingering/fine manipulation. In support of these conclusions, Dr. Roy wrote, "Severe pain affecting the left shoulder and left upper arm."[3]

B.    *Administrative Hearing*

The administrative law judge (ALJ) held a hearing on August 9, 2006, at which Brooks and a vocational expert testified. Brooks testified that she was still having trouble with both her hands and the left side of her neck and shoulder. Despite her carpal-tunnel surgery, she still experienced

---

[2]It appears the significant amounts of ibuprofen had an adverse affect on Brooks's stomach. Brooks herself testified to this at the hearing, and in the same notes in which Dr. Roy changed Brooks's painkiller, he noted that a recent endoscopy had revealed "antral gastritis."

[3]Dr. Roy also concluded that Brooks had environmental limitations in the areas of humidity/wetness, hazards, and fumes, odors, chemicals and gases.

wrist pain and her fingers "drawing up" or bending and stiffening, and it was extremely painful for her to lift. When asked if she would be able to pick up paper clips on a table in front of her, she testified that she might be able to, but that her hands might draw up, and that she continually dropped things. Brooks stated that she almost broke her dentures the morning of the hearing when she was trying to brush them and her hands "release[d]." She testified that her symptoms were worse on her left side, that she slept in wrist braces and wore a neck brace continuously while in the house, that she experienced pain on the left side from her hand all the way to her neck and shoulder, and that she had slight continuous headaches. She further testified that her left shoulder ached constantly and that the only way she could sleep was when she took 800 milligrams of ibuprofen, but stated as of the time of the hearing that she just "tr[ies] to take" the pain because "nothing else eases it and Ibuprofen messes my stomach up." Brooks cut her hair short because the pain in her left arm prevented her from reaching above her head to fix it.

As for her daily activities, Brooks testified that she had to start at 4:30 or 5:00 in the morning because it took her a long time to bathe and dress, and that she required her 17-year-old daughter's assistance to shave under her arms or apply deodorant and sometimes to put on her pajamas. Brooks estimated that she spent approximately 30 minutes to an hour per day doing chores. Brooks said she did not pick up the laundry basket, but was sometimes able to do the laundry by picking up one piece at a time; other times her daughter did it while Brooks told her what to do. Brooks also stated that she swept, although with a lot of difficulty because her shoulder "gives [her] a fit" and her hands lock around the handle of the broom. She testified that she and her daughter made the beds together and that her daughter did most of the cooking and washing the dishes. Brooks stated that a neighbor took care of her yard for her. She testified that she went grocery shopping about once a week, taking

her daughter or someone else who would "put the stuff in a basket and come out with me and bring it to the house."

Brooks testified that she had to lay down two or three times in a typical day, and that she could stand for 10-15 minutes before she needed to sit down and rest. She estimated that she could walk for 5-10 minutes before being short of breath and needing to rest, and that she could lift no more than 5 or 10 pounds. She stated that there were days she stayed in bed because she was too stiff to move; this happened two or three times a month in the summer, and about four days a week in the winter.

Brooks testified that she was able to drive and did so every day. She drove her daughter to school during the school year and also during summer school. She described participating in church activities including choir on Saturdays (for about an hour); worship and Bible study on Wednesdays (for two hours); overseeing youth Bible study on Thursdays (for an hour); and Sunday School, church services, and other programs on Sundays (for approximately 2-4 hours). When asked if her physical problems gave her difficulties in her church activities, she explained that she mostly sat during church activities, including choir rehearsal.

The vocational expert (VE) explained that Brooks's past relevant work was as a certified nurse technician, a medium, semi-skilled occupation. In response to the ALJ's question whether Dr. Gulbenk's RFC findings – occasionally lifting 50 pounds, frequently lifting 25 pounds, standing 6 hours per day, sitting 6 hours per day, and no other limitations – allowed Brooks's past work, the VE stated that they did. The ALJ then asked about an individual "capable of lifting less than ten pounds occasionally, no indication for frequent lifting, standing, walking less than two hours out of eight, sitting for less than six. Limitations in the use of the upper extremities, no postural activities except

for occasional balancing, limited in the ability to reach and handle gross manipulation, limited in the ability to tolerate vibrations, humidity, wetness, hazardous machinery, fumes, odors, gas, dust." The VE responded that the capabilities of such a person were "less than a full range of work at any exertional level, it's like less than a full range of sedentary."

C.      *ALJ Decision*

On October 24, 2006, the ALJ issued his decision concluding that Brooks was not disabled. The decision followed the sequential five-step analysis explained in 20 C.F.R. § 404.1520. The ALJ found that Brooks had three severe impairments 1) cervical spine spondylosis, 2) obesity, and 3) "status post bilateral carpal tunnel release." The ALJ considered Brooks's shoulder pain separately from the above impairments and concluded that it was not severe, whether taken alone or in combination with other impairments. The ALJ explained:

> [Brooks] testified her left shoulder pain is constant but refers to this pain in relation to her neck pain. Throughout the record she alleged shoulder pain multiple times. However, she complained of more neck and hand pain. On numerous occasions she failed to mention any difficulty with her left shoulder. The record lacks appropriate radiological or diagnostic techniques that would support a medical determinable impairment.

The ALJ further concluded that Brooks was capable of performing her past relevant work as a certified nurse technician, and thus was not disabled for purposes of the Social Security Act.

In reaching this decision, the ALJ determined that Brooks's testimony concerning the "intensity, persistence, and limiting effects" of the symptoms of her medical impairments was "not entirely credible." The ALJ concluded that Brooks's subjective allegations were not supported by either the objective medical evidence or her established daily activities. The ALJ cited the fact that Brooks alleged constant debilitating pain, but had not been prescribed muscle relaxants or narcotic

pain medication. He also cited the fact that, despite receiving treatment for shoulder pain, "there [is] no correlating testing such [as a] radiological test or a specific diagnosis." The ALJ rejected Brooks's testimony about needing frequent rests due to shortness of breath as "not consistent with participation in church activities including choir."

With regard to Brooks's RFC, the ALJ stated:

> [Brooks] has the residual functional capacity to perform medium work (lift/carry 50 pounds occasionally and 25 pounds frequently, stand/walk or sit for 6 hours out of an 8-hour workday) without additional limitations prior to December 2004. Following December 2004 the claimant had no severe impairments that would preclude her from performing her past relevant work as she had obtained maximum medical improvement.

The physical functional limitations the ALJ found were the same as those recommended by Dr. Gulbenk. The ALJ stated that Dr. Gulbenk's assessment in her September 2004 non-examining consult "were well supported and consistent with the daily activities, and thus accorded great weight." In contrast, the ALJ gave "no weight" to Dr. Roy's April 2006 medical source statement because it "lack[ed] objective findings for upper left extremity impairments and limits." The ALJ also found that Brooks's daily activities "directly refute" limitations to the degree suggested by Dr. Roy, and that Dr. Roy's own treatment records did not support his opinion.

The Appeals Council denied Brooks's request for review of the ALJ's decision on March 1, 2007.

D.     *District Court Proceedings*

In May 2007, Brooks filed a civil action to review the agency decision. She moved for judgment on the record, arguing among other things that the ALJ erred in affording no weight to Dr. Roy's assessment and controlling weight to Dr. Gulbenk's, that the ALJ failed to give good reasons

for disagreeing with Brooks's primary care physician, and that her left shoulder condition was a severe impairment. The magistrate judge denied the motion in a brief order, adopting the arguments made in the Social Security Administration's response to the motion. In a single-page order, the district court adopted the magistrate judge's report and recommendation over Brooks's objections. It explained its rejection of Brooks's argument that the ALJ improperly gave no weight to Dr. Roy as follows:

> The Plaintiff is incorrect[]. The Administrative Law Judge found the opinion of Dr. Roy to be unsupported by his own treatment record, inconsistent with Plaintiff's daily activities, and inconsistent with the record as a whole. Dr. Roy's treatment notes did not contain any radiological or diagnostic techniques such as observed swelling, withdrawal of synovial fluid. His treatment was conservative prescribing only Tylenol and ibuprofen. Failure to consider or use such techniques or steroidal injection or surgery suggests the shoulder injury was much milder than Dr. Roy opined.
> []
> In contradiction to Dr. Roy's opinion, the Administrative Law Judge considered the opinion and diagnoses of Drs. Weikert, Dulbenik, and Gulbenk.[4] The Administrative Law Judge considered these and the whole record in giving greater weight to their opinions than to those of Dr. Roy. The determination of the Administrative Law Judge is amply supported by the evidence.

Brooks timely appealed.

**DISCUSSION**

A.    *Legal Standards*

This court reviews district-court decisions in social security cases *de novo*. *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). However, appellate review is limited to

---

[4]The order incorrectly implies that "Dr. Dulbenik" and Dr. Gulbenk are two separate physicians. "Dr. Dulbenik" does not exist; court documents submitted by the Commissioner misspelling Dr. Gulbenk's name are the likely source of the confusion.

-12-

determining whether the Commissioner's decision "is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's decision is based upon substantial evidence, this court must affirm, even if substantial evidence exists in the record supporting a different conclusion. *Id*. at 604-05.

A social security disability determination is made according to the five-step analysis set out in 20 C.F.R. § 404.1520:

> First, [Brooks] must demonstrate that she is not currently engaged in substantial gainful employment at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, [Brooks] must show that she suffers from a severe impairment. 20 C.F.R. § 404.1520(c). Third, if [Brooks] is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months, which meets or equals a listed impairment, she will be considered disabled without regard to age, education, and work experience. 20 C.F.R. § 404.1520(d). Fourth, if the Commissioner cannot make a determination of disability based on medical evaluations and current work activity and [Brooks] has a severe impairment, the Commissioner will then review [Brooks's] residual functional capacity (RFC) and relevant past work to determine if she can do past work; if so, she is not disabled. 20 C.F.R. § 404.1520(e).

*Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002). If, under the fourth step, Brooks's impairment prevents her from doing past work, the analysis proceeds to the fifth step: the "Commissioner will consider her RFC, age, education and past work experience to determine if she can perform other work. If she cannot perform other work, the Commissioner will find her disabled. 20 C.F.R. § 404.1520(f)." *Id*.

-13-

For the fifth step, the burden of proof shifts to the Commissioner. *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 836 (6th Cir. 2006). To meet this burden,

> the Commissioner must make a finding "supported by substantial evidence that [Brooks] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This kind of "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [Brooks's] individual physical and mental impairments.'" *Id*. (citations omitted).

*Howard*, 276 F.3d at 238.

The Social Security Administration generally gives the most weight to opinions from a claimant's treating source. *See* 20 C.F.R. § 404.1527(d)(1)-(2). If a treating source's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other record evidence, it is entitled to controlling weight. *See id.* § 404.1527(d)(2). When the treating source's opinion is not given controlling weight, the agency considers the set of factors that apply in determining the proper weight to give any medical opinion. *See id.* § 404.1527(d) & (d)(2). These include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the amount of relevant evidence the medical source provides, how consistent the medical source's opinion is with the record as a whole, and whether the medical source is a specialist. *See id.* § 404.1527(d). In any case, the ALJ is required to "give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1527(d)(2)). Good reasons are reasons that are "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent

-14-

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406-07 (6th Cir. 2009).

B.      *Analysis*

On appeal, Brooks contends that the ALJ did not give good reasons for giving no weight to treating physician Dr. Roy's assessment. Specifically, she argues that the rationales given by the ALJ – that 1) on numerous occasions Brooks failed to mention any difficulty with her left shoulder, 2) there was no testing or other objective evidence of a left-shoulder condition,[5] 3) Brooks's daily activities refute the limitations assigned by Dr. Roy, and 4) Dr. Roy's own medical records fail to support his assessment – are faulty. Brooks also argues that it was improper for the ALJ to base his RFC finding on Dr. Gulbenk's recommendation because Dr. Gulbenk's September 2004 assessment necessarily did not consider the significant medical events and records that occurred afterward. Finally, Brooks argues that the ALJ failed to properly credit Brooks's symptoms, including pain, and that Brooks's testimony is supported by the evidence.

1.      Whether the ALJ gave good reasons for giving no weight to Dr. Roy's opinion.

a.      Brooks's failure to mention difficulties with her left shoulder

The ALJ's assertion that "[o]n numerous occasions [Brooks] failed to mention any difficulty with her left shoulder" is problematic. The ALJ's opinion states a mere two sentences before that, "[t]hroughout the record she alleged shoulder pain multiple times." Further, Brooks's allegations of

---

[5]The ALJ did not explicitly list this as a rationale for giving no weight to Dr. Roy's opinion. The ALJ cited this point in relation to his evaluation at step two (determining Brooks's severe impairments) rather than at step five (evaluation of Brooks's RFC and consideration of medical source statements on the issue). Regardless, because Dr. Roy's RFC conclusion depended upon Brooks's left shoulder injury/pain, the ALJ's rejection of Brooks's shoulder trouble as a severe impairment is an implicit reason for giving no weight to Dr. Roy's opinion.

shoulder difficulty are well documented in her medical records. She initially complained of shoulder pain at the time of her 2003 work injury. She then complained of left-shoulder pain to Dr. Weikert in August 2004, September 2004, November 2004, and February 2005, four out of the five visits to Dr. Weikert in the record. In her 17 visits total to Dr. Roy (16 of them between February 2005 and May 2006), Brooks was treated by Dr. Roy and specifically complained of left-shoulder pain or restricted movement 10 or 11 times. It also appears that Brooks complained about her shoulder when she sought chiropractic treatment in February 2006. On the whole, Brooks complained of shoulder problems more often than not. That Brooks did not complain of shoulder problems every single time she saw a doctor is not a good reason to discount the numerous times she did complain.

Relatedly, the ALJ discounts the number of times that Brooks complained of shoulder pain because she often complained about it in conjunction with her neck and/or hand pain. *See* A.R. 17 ("She testified her left shoulder pain is constant, but refers to this pain in relation to her neck pain. Throughout the record she alleged shoulder pain multiple times. However, she complained of more neck and hand pain."). But it makes sense that Brooks's shoulder complaints often overlapped with complaints concerning her neck, hand and wrist.[6] When Brooks was first injured, she complained of pain and numbness in all of those locations – shoulder, wrist, neck, and hand. The ALJ failed to explain how Brooks's concurrent experience of neck or wrist or hand pain along with her shoulder pain cuts against the allegation of shoulder pain. Accordingly, the ALJ's rationale that Brooks failed

---

[6]It is not the case, as the ALJ asserted, that Brooks "complained [] more" of neck and hand pain. Brooks complained about neck, shoulder, and hand pain roughly the same amount before February 2005. After February 2005, she complained of shoulder pain numerous times, wrist/hand pain twice, and neck pain once.

to mention difficulties with her left shoulder is not supported by substantial evidence and is not a "good reason" to afford no weight to Dr. Roy.

           b.      No testing or other objective evidence of a left-shoulder condition

The ALJ reasoned, "Although[] the treating record reflects treatment for shoulder pain, there [is] no correlating testing such [as a] radiological test or a specific diagnosis. The presence of a medically determinable impairment must be supported by objective medical evidence and cannot rest solely upon a claimant's subjective allegations. 20 [C.F.R. §] 404.1508." The ALJ concluded, "The April 24, 2006, opinion of Dr. Roy lacks objective findings for upper left extremity impairments and limits. Therefore his opinion is given no weight." (A.R. 20.)

20 C.F.R. § 404.1508 states:

> What is needed to show an impairment. . . .
>
> Your impairment must result from anatomical, physiological, or psychological abnormalities *which can be shown by medically acceptable clinical and laboratory diagnostic techniques*. A physical or mental impairment must be established by medical evidence *consisting of signs, symptoms, and laboratory findings*, not only by your statement of symptoms (see § 404.1527). (See § 404.1528 for further information about what we mean by symptoms, signs, and laboratory findings.)

(Emphasis added.) 20 [C.F.R. §] 404.1528 states in part:

> Symptoms, signs and laboratory findings.
> . . .
>
> (b) Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs *must be shown by medically acceptable clinical diagnostic techniques*. . . .
>
> (c) Laboratory findings are anatomical, physiological, or psychological phenomena *which can be shown by the use of medically acceptable laboratory diagnostic techniques*. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests.

-17-

(Emphasis added.) Finally, 20 C.F.R. § 404.1529 states in relevant part:

How we evaluate symptoms, including pain.

(a) General. In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. *By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c)*.

(Emphasis added.)

In more than one place, the regulations state that objective medical evidence is medical signs and laboratory findings as defined in § 404.1528(b) and (c). *See* 20 C.F.R. §§ 404.1512(b)(1), 404.1529(a); *see also id.* § 404.1508 . Since Dr. Roy did not conduct any lab tests, the only issue is whether Dr Roy employed any "medically acceptable clinical diagnostic techniques" under § 404.1528(b). On this record, we need not specifically define "clinical diagnostic techniques" in order to observe that it would be difficult to conclude that Dr. Roy employed any. Even if simply observing Brooks's shoulder would be a sufficient "technique," Dr. Roy's notes referring to reduced motion and muscle spasm do not indicate whether he observed these aspects about Brooks's shoulder or whether she reported them. Thus, we conclude that the ALJ's conclusion that Dr. Roy did not perform specific testing or show other objective medical evidence of a left-shoulder condition is supported by substantial evidence.

The question that necessarily follows is whether this is a "good reason" to afford Dr. Roy's conclusions no weight. While it is reasonable to give less weight to an opinion that lacks medical signs and lab findings to support it, the record *does* contain objective medical evidence of Brooks's shoulder impairment. In February 2005, Dr. Weikert's medical records state that Brooks's "left

-18-

shoulder reveals pain with supraspinatus stress test." Further, there are numerous tests and other clinical diagnostic information in the record supporting Brooks's carpal-tunnel syndrome and cervical-spine spondylosis; again, two impairments that the ALJ acknowledged were severe. And there is no indication that the doctors who treated Brooks for those conditions regarded her shoulder pain (of which Brooks complained at the time) as resulting from a separate condition.[7]

Under other circumstances, the ALJ's lack-of-testing-or-objective-evidence rationale could be a good reason to dismiss Dr. Roy's opinion. However, on this record, we cannot conclude that Brooks's shoulder pain was distinct from her other well-documented and fully diagnosed impairments. Thus, the ALJ did not articulate a good reason.

c. Brooks's daily activities refute the limitations assigned by Dr. Roy

The ALJ's opinion characterized Brooks's daily activities as follows:

Her daily activities consist of driving her daughter to school everyday, going to the library, going to choir practice for 1 hour once a week, attending worship service every Wednesday, conducts youth bible study on Thursday, Sunday she goes to church

---

[7]The Commissioner would respond that the carpal-tunnel and spondylosis record evidence cannot shore up Dr. Roy's medical records because Dr. Roy himself chose the alternate diagnosis "bursitis" (but did not perform typical diagnostic tests for bursitis, and only treated it conservatively with ibuprofen and Tylenol). This is true in part – in his medical-source statement, Dr. Roy does note that Brooks "[h]as bursitis affecting left shoulder." However, in the same document, Dr. Roy wrote "[n]europathic pain left shoulder," an indication that he had determined that Brooks's shoulder pain *was* related to her prior nerve injuries, the carpal-tunnel syndrome and cervical-spine spondylosis. *See* The Merck Manuals Online Medical Library: The Merck Manual for Healthcare Professionals, available at http://www.merck.com/mmpe/sec16/ch209/ch209c.html?qt=neuropathic%20pain&alt=sh ("Neuropathic pain results from *damage to or dysfunction of* the peripheral or *central nervous system*. . . . Neuropathic pain is suggested by its typical symptoms when *nerve injury* is known or suspected.") (Emphasis added). *see also* http://www.merck.com/mmpe/sec04/ch042/ch042f.html#sec04-ch042-ch042f-992 (carpal tunnel syndrome is a nerve compression syndrome); http://www.merck.com/mmpe/sec16/ch224/ch224d.html?qt=cervical%20spine%20spondylosis&alt=sh (cervical spondylosis categorized as a "neurologic disorder").

from 10:00 to 12:30 and 3:00 to 5:00, and during holidays she attends church additionally.

The ALJ concluded that those activities "directly refute" the limitations Dr. Roy found. These limitations included only occasionally lifting less than ten pounds; standing or walking less than 2 hours in an 8-hour work day; sitting less than 6 hours in an 8-hour work day; no climbing, kneeling, crouching, or crawling; being limited in reaching (including overhead) and handling (gross manipulation); and being limited in exposure to vibration, humidity, wetness, machinery, heights, and fumes.

The ALJ did not explain *how* Brooks's daily activities directly refuted Dr. Roy's stated limitations. Brooks's activities mostly involve sitting inside, and traveling by car to places where one generally sits inside. None of her daily activities necessarily involve the lifting, extended standing, extended walking or sitting, climbing or crouching from which she was restricted. Accordingly, the rationale that Brooks's activities "directly refute" Dr. Roy's limitations is not well supported by the record, and thus is not a good reason to devalue Dr. Roy's assessment.

d.     Dr. Roy's own medical records fail to support his assessment

We have already discussed Dr. Roy's record entries depicting Brooks's pain and limitation of movement and his lack of record entries demonstrating testing or clinical techniques. The only significant point on this topic not yet addressed concerns Dr. Roy's recommended environmental limitations. Dr. Roy checked boxes indicating that Brooks should limit her exposure to 1) vibrations, 2) humidity and wetness, 3) hazards (machinery, heights, etc.), and 4) fumes, odors, chemicals, and gases. The ALJ's conclusion that the assessment is unsupported is correct as to the environmental-limitation portion of Dr. Roy's assessment. Dr. Roy wrote "Recurrent upper [r]espiratory tract

-20-

infections and allergy" as the explanation for his assigned limitations. But Dr. Roy's medical records show only a single occurrence of a respiratory-tract infection, and make no mention of allergies.

The fact that Dr. Roy's records fail to support his environmental limitations is undoubtedly a good reason to afford no weight to that part of Dr. Roy's assessment. However, this limited deficiency is not sufficient reason to give *no* weight to *any portion of* Dr. Roy's assessment.

Of the four "good reasons" that the ALJ can be understood to have offered for his decision to afford no weight to Dr. Roy's assessment, two are not supported by the record. Another, although technically supported by the record, is not a legitimate rationale for dismissing Dr. Roy's assessment. The final reason justifies affording no weight only to Dr. Roy's suggested environmental limitations.

2.      Whether the ALJ properly gave "great weight" to Dr. Gulbenk's RFC determination

Dr. Gulbenk concluded that Brooks could perform medium work (which involves lifting/carrying 50 pounds occasionally and 25 pounds frequently, and standing, walking or sitting for 6 hours out of an 8-hour workday), that she was unlimited in her ability to push and pull, and that she had no manipulative or postural limitations. The ALJ gave Dr. Gulbenk's RFC assessment "great weight" and ultimately assigned Brooks the exact same RFC as Dr. Gulbenk did. Of the three types of medical sources (non-examining sources, examining sources, and treating sources), a non-examining, non-treating physician is generally given the least weight. *See* 20 C.F.R. § 404.1527(d)(1)-(2). However, it is not always illegitimate for an ALJ to decide to accord greater weight to an agency physician over a treating source: "In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources." *Blakley*, 581 F.3d at 409 (citing Soc. Sec. Rul. 96-6p, 1996 WL

374180, at *3 (July 2, 1996)). "One such circumstance may occur, for example, when the 'State agency medical . . . consultant's opinion is based on a review of a complete case record that . . . provides more detailed and comprehensive information than what was available to the individual's treating source.'" *Id*.

Here, though, the ALJ gave inadequate reasons for affording Dr. Gulbenk's opinion great weight. Dr. Gulbenk's September 2004 assessment was necessarily limited in the medical records he reviewed, since many of Brooks's medical records are from after that date. This is especially significant because when Dr. Gulbenk examined Brooks's records, Brooks had just completed carpal tunnel release surgery on both hands and was seeing Dr. Weikert for follow up. At that time, Brooks's most recent doctor visit (August 2004) had been optimistic – although Brooks complained of left shoulder pain, locking of her right ring finger and some generalized pain, numbness, and tingling in her fingers, she had only recently completed her second surgery on June 29, 2004. Dr. Weikert noted that her incisions had healed well and that she had "good capillary refill, intact light touch sensation, and a negative Phalen's test in both hands." He anticipated a thorough recovery – "she should be nearing a point where she can work without restrictions soon." Thus, in September 2004, Dr. Gulbenk's assessment regarded Brooks's carpal-tunnel syndrome as "severe . . . [but] expected to improve to nonsevere by 12 mos [after alleged onset date]; pain is expected to subside."

But subsequent medical records show that Dr. Gulbenk's prediction proved inaccurate. Brooks continued to complain of pain to Dr. Weikert in visits leading up to and after the date 12 months after the alleged onset of her impairment (December 20, 2004). Eighteen days after Dr. Gulbenk's determination that Brooks could occasionally lift and/or carry 50 pounds, and push and pull without limitations, Dr. Weikert ordered a repeat nerve-conduction study and limited Brooks to

lifting 20 pounds and to grasping, pushing and pulling less than 50% of the day. The nerve-conduction study was conducted October 26, 2004, and noted abnormal results, likely from Brooks's previous carpal-tunnel syndrome. The report portion of the study concluded that "if [Brooks's] symptoms persist repeat median conductions would be useful to rule out a worsening or acute cts." Thus, the medical evidence indicated continuing carpal-tunnel symptoms inconsistent with Dr. Gulbenk's prior estimations. Further, Brooks saw her treating physician, Dr. Roy, 16 times after Dr. Gulbenk's September 2004 assessment. These records document Brooks's complaints of shoulder pain, wrist pain, restricted shoulder movement, weak hand grip, and various other symptoms.

Accordingly, in affording Dr. Gulbenk great weight, the ALJ relied upon a non-treating, non-examining source who reviewed Brooks's records a year and a half before Dr. Roy's assessment, and who did not have access to significant medical records from the period after her assessment that contained evidence of continuing problems with a relevant impairment. The ALJ could perhaps have relied on Dr. Gulbenk's dated assessment if the ALJ made clear that he had considered the effect of the subsequent medical records on the reliability of that assessment. *See Blakley*, 581 F.3d at 409 ("[W]e require some indication that the ALJ at least considered [the subsequent medical records] before giving greater weight to an opinion that is not based on a review of a complete case record." (internal citations and quotation marks omitted)). The ALJ did not do this here, however. The ALJ's opinion only acknowledges Brooks's first and last visits to Dr. Roy, and neglects to mention the numerous other documented visits.

As we have noted above, the ALJ's opinion mischaracterizes Brooks's complaints of shoulder problems to Dr. Roy, and only selectively describes Brooks's subsequent visits to Dr. Weikert. Though the opinion mentions that Dr. Weikert concluded that Brooks had reached maximum medical

-23-

improvement in November 2004 and released the temporary lifting restrictions he had imposed in February 2005, the ALJ gave no indication that he considered Dr. Weikert's November 2004 suggestion that "if [Brooks's] neck and shoulder pain appear[] to be worsening, then she should consider having this evaluated," and his notation on February 2005 that Brooks's left shoulder was "killing" her. The opinion also ignores Brooks's October 2004 repeat nerve-conduction study. While the opinion *does* state that Gulbenk's limitations were consistent with Brooks's later account of her daily activities, this does not substitute for the ALJ's failure to demonstrate consideration of all of the relevant subsequent medical records.

Because there is no indication that the ALJ separately considered all of the relevant medical records that post-dated Dr. Gulbenk's assessment when deciding to afford it great weight, the ALJ impermissibly violated the agency's rules, warranting remand.

3.      Whether the ALJ failed to properly credit Brooks's symptoms, including pain

The ALJ concluded that Brooks's testimony concerning the intensity, persistence and limiting effects of her symptoms was "not entirely credible."

On the whole, the ALJ's conclusion is supported by substantial evidence. Brooks's testimony portrayed someone with very debilitating limitations – she testified that she was in constant pain, that during the winter she could not leave bed an average of four days per week, and that she could walk only about 5 to 10 minutes or stand 10 to 15 minutes because of being short of breath. The ALJ cited Brooks's daily driving, significant involvement in church activities, and performance of household chores as conflicting with Brooks's account of her symptoms. The ALJ may consider a claimant's daily activities in determining the credibility of her complaints of pain. *See Vance v. Comm'r of Soc.*

*Sec.*, 260 F. App'x. 801, 805 (6th Cir. 2008) (unpublished); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). In particular, the ALJ found Brooks's shortness-of-breath testimony inconsistent with participation in her church choir. The ALJ also noted that "[d]espite her alleged constant debilitating pain, she has not been prescribed muscle relaxants or narcotic pain medication."

Brooks raises several arguments in response, including that she stopped taking the ibuprofen for pain because it upset her stomach, that she had been prescribed oxycodone, Percocet, and Ultracet, and that the ALJ did not acknowledge the other steps she took to avoid pain such as getting her hair cut short so she would not have to reach for it, and having her daughter apply her underarm deodorant. While some of these arguments are legitimate, none undermine the valid substantial evidence the ALJ cited to support his conclusion. *See Blakley*, 581 F.3d at 407 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

The ALJ's conclusion that the Brooks's own account of the intensity, persistence and limiting effects of her symptoms was less than wholly credible is therefore supported by substantial evidence.

## **CONCLUSION**

Despite the fact that the ALJ's partial rejection of Brooks's hearing testimony is supported by substantial evidence, the ALJ did not give good reasons for giving *no* weight to Brooks's treating physician's assessment of her limitations and giving great weight to the assessment of an agency consulting physician. Several of the reasons the ALJ gave for discounting Brooks's treating physician's opinion were not supported by the record, and the two that were did not provide "good

reason" to reject the entirety of Dr. Roy's opinion. And, there is no indication that the ALJ considered significant medical records generated after the agency physician's September 2004 assessment.

Treating-physician opinions that are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other record evidence are entitled to *controlling weight*. *See* 20 C.F.R. § 404.1527(d)(2). In the event that a treating physician's opinion is not entitled to that high level of deference, an ALJ must present *good* reasons, as articulated in the applicable regulations, not only for the lack of controlling weight afforded the treating physician, but for the weight afforded to the agency physician or other competing opinion. *See id.*

After careful review of the record before us, we are convinced that this standard was not met here. Accordingly, we REVERSE the opinion of the district court and REMAND to the agency for thorough consideration of the entire record.